## Case No. 79.

### The ADELIA.

[1 Hask. 505.][1]

District Court, D. Maine. Feb., 1874.

TOWAGE—NEGLIGENCE—BURDEN OF PROOF.

1. A contract for towage requires from the tug that degree of care and skill which prudent navigators usually employ.

2. When towage is voluntarily attempted in dangerous and perilous places, the tug must exercise skill and care commensurate with the perils it assumes to encounter.

3. The burden rests upon the libellant, who seeks damages from negligent towage service, to prove that the injury resulted from the fault of the tug.

In admiralty. Libel in rem for damages sustained from negligent and improper towage service. Defense that the injury resulted from inevitable accident. The cause was heard on libel, claim, answer and proof. [Decree for libellants.]

A. A. Strout and John C. Dodge, for libellants.

Wm. L. Putnam, for claimants.

FOX, District Judge. This steam tug is proceeded against by the owners of the schooner Harry L. Whitten of Quincy, to recover the damages sustained by said schooner being forced upon the rocks on the eastern shore of the Kennebec river above Gardner, when the tug was attempting to wind her preparatory to towing her to sea. The injury took place in the forenoon of May 26, 1873. The H. L. Whitten is a new three masted vessel

[1][Reported by Thomas Hawes Haskell, Esq., and here reprinted by permission.]

of 481 tons, and had taken on board a full cargo of ice at the Knickerbocker loading pier at Farmingdale. On the morning in question, she was winded by her master and crew with warps and the force of the current while at this pier, and without the aid of a tug, and then dropped down river 400 to 500 yards and came to anchor.

The Adelia is a powerful tug of greater steam capacity than any other then employed on the river, surpassed at that time by one only on the Penobscot, all other tow boats in this state being much inferior to her; the claimants, the Knickerbocker Towage Co., control the towage business on this river, and they had at that time contracted for a more powerful tug, and it has since been completed, and is now employed in the business upon the river and at sea. The loading wharf of the ice company is on the western shore, is built upon a shoal in three blocks or piers of logs, is about 250 feet wide on the river, and extends from the bank into the river about 300 feet at the upper corner and nearly to the channel, where there was at this time about fourteen feet at low water, the freshet which had increased the depth about four feet at its height, having fallen about one half on May 26. The current of the river as it passed by the upper corner of the loading pier run at the rate of four to five knots, and set strongly towards the eastern shore, forming an eddy in front of the piers, which was of a triangular form about 100 feet in width at its base, which was a short distance below the lowest pier. From these piers there was a depth of about fourteen feet, for a width of 300 feet. On the eastern shore, 500 to 600 feet below the lower pier, a shoal extends about half way across the river with large rocks upon it. The center of the current passed near the outer point of this shoal, and then turned towards the west shore. In this condition of things the master of the Adelia, with the tide about two hours flood, made fast with the usual lines to the starboard side of the schooner, and after her anchor was free, took the entire control of both vessels, being at his wheel, with the master of the schooner at her helm. Steam was put on, the vessels were taken slowly up river, just below the pier they swung off somewhat into the eddy, the object being to place the stern of the schooner in the eddy, there to be retained by the tug, whilst the bows by the force of the current would be swung round, so that the vessel could be properly guided by the tow ahead. In the present case it unfortunately happened that the stern of the vessel was not held and retained in the eddy, but she was taken out bodily into the current, and was set by the force of the current at the same time down river, and over towards the eastern shore, forcibly striking upon the rocks on the shoal, and with such violence as to do great damage to her keel and garboard, causing her to fill with water and sink on the western

shore, where she was towed by the tug. She was subsequently taken into the Portland dry dock, and there repaired at considerable expense, for the recovery of which this libel is instituted.

"It must be conceded that an engagement to tow does not impose either an obligation to insure or the liability of common carriers. The burden is always upon him, who alleges the breach of such a contract, to show either that there has been no attempt at performance, or that there has been negligence or unskillfulness to his injury in the performance. The contract requires no more than that he who undertakes to tow shall carry out his undertaking with that degree of caution and skill, which prudent navigators usually employ in similar services; but there may be cases in which the result is a safe criterion by which to judge of the character of the act which has caused it." The Webb, 14 Wall. [81 U. S.] 414.

In The Syracuse, 12 Wall. [79 U. S.] 171, the court says: "It (the law) does require on the part of those persons engaged in her management (a towboat,) the exercise of reasonable care, caution, and maritime skill, and if these are neglected and disaster occurs, the towing boat must be visited with the consequences."

In Transportation Co. v. Downer, 11 Wall. [78 U. S.] 134, the language is: "A presumption of negligence from the simple occurrence of an accident seldom arises, except when the accident proceeds from an act of such a character that when due care is taken in its performance, no injury ordinarily ensues from it in similar cases, or where it is caused by the mismanagement or misconstruction of a thing over which the defendant has immediate control, and for the management or construction of which he is responsible."

Guided by these authorities, does the evidence in the present case establish negligence or want of care on the part of the master of the tug, it being admitted that the master and those on board the schooner in no way contributed to the disaster? It is said that the place chosen for winding this vessel was dangerous and unsafe, and that it might have been safely accomplished at the anchorage. The testimony shows that on some occasions vessels had been winded near where this vessel was at anchor, but that the most usual practice had been to take them up into the eddy, and avail themselves of the two counteracting forces, that of the eddy to hold and the current to wind the vessel, and that this had in every instance been successful; but none of these vessels were so large as the Whitten; that the place selected was much more dangerous than that near the anchorage the court cannot doubt, as the current was much stronger, and the shoal and rocks necessarily endangered the safety of the vessel, if she became beyond the control of the tug; but

the advantages from the eddy and current combined greatly contributed to the ease and speed with which the winding could be accomplished, whilst at the other place there was no eddy to profit by, and the winding could only be done by the tug moving to and fro in a narrow space, though somewhat wider than at the piers. It is said that there would be danger from a collision with the bridge at Gardner, if for any cause the tug did not wind the schooner at the first attempt; but this objection does not appear to the court of any great weight, considering the distance more than a half mile, which the bridge was below the anchorage. The court has little doubt that the anchorage was the safest place for this object, and that the main reason why it was not there attempted was, that ordinarily the winding was much sooner accomplished in the other position, and without the trouble attending the backward and forward movements of the tug, which were requisite in still water to wind the vessel successfully.

Under the circumstances the court does not discover that want of proper care on the part of the master of the tug in attempting to wind the schooner at the place he did, which should subject the tug to liability for this disaster. The master of the tug well knew all the dangers which attended this locality, which were neither few nor small. He knew the current there was more violent than at the anchorage, that the width of river for his movements did not exceed 300 feet, with the current setting strongly to the easterly shore as well as downward, that the shoal with the rocks thereon projected nearly half the width of the river and into the current, and that if the tow should become unmanageable and escape the control of the tug, she must be taken down broadside by the current and thrown upon the shoal and rocks, inevitably subjecting her to damage; that in order to prevent this, it was absolutely requisite that the tow should be held back, and not presented broadside to the current, and to accomplish it, that the stern and larger portion of the hull of the vessel must not be allowed to pass out of the eddy, but must without fail be held therein, as when the tow was beyond the eddy the tug was powerless to govern her, either by preventing her shooting on towards the eastern shore, or swinging her bow down river so that she could pass down with the current. Knowing as the master must all these dangers, and if he did not know them then he was not qualified for his position, and having without consultation with the master of the schooner chosen to make the attempt to wind her in that locality, in the opinion of the court, a much higher degree of care, skill, and attention was demanded of him, than if he had undertaken the same movement under circumstances free from danger. If the place selected had been deep, broad, open, still wa-

ter, free from rocks and shoals, it is clear that the master would not have been expected to exercise the same carefulness and attention and good judgment as to the speed and management of his tug, and in holding the tow always under instant control, as he would when there was great and immediate danger, with strong forces to contend with, which if not properly met involved the destruction of the property under his charge. In the one case, the consequences attending his neglect would not ordinarily result in loss or damage to any great extent; the tow by reason of too great speed might run nearer the shore, or from want of proper control might run ashore upon soft bottom, but no injury would probably be sustained thereby; whilst in the other position, with rocks and shoals and rapids to encounter, if the tow was not entirely in control. of the tug, by running a space of not more than fifty feet from the intended course. she might subject the tow to immediate peril and disaster.

The tug is only chargeable with reasonably proper skill and care; but in the opinion of the court, these are relative terms, and must be understood to be such as are reasonable and proper, and demanded by the peculiar circumstances and emergencies of the case. The master admits that everything depended on availing himself of the eddy; that his motive in attempting to wind the vessel at this place was wholly the combined forces resulting from the eddy by retaining the stern, whilst the current swung round the bow, and that if he lost the eddy and run out of it, his tug was powerless to save the vessel. He admits that he failed to accomplish his intended purpose; and in the opinion of the court the circumstances attending the disaster are such as to require of him a reasonable and satisfactory explanation of the cause and occasion, and why the result in the present case was so very different from what had been previously the case.

The master of the tug testifies: "After they started ahead I gave the speed bell as was my practice; I steamed ahead for the Knickerbocker wharf, and when within 300 feet of the lower pier slowed down and let her range up toward the pier; the vessels' headway nearly stopped, and finding I was not going to reach out just as I wanted, I touched her up with the slow bell that she might range further up; ranged out by the lower pier and everything looked well in my judgment for a good swing; could not ask for anything better than it looked at that time. The tide took the vessel, and as soon as her bow ranged into the main current, gave the engineer the bell to back her and back her strong. The tide took her and we ranged off from that pier sidewise to the current until we went down onto the shoal and rocks, when she swung round and I shoved her onto the other shore.

I went up as high as I did because I wanted the stern of the schooner to come right up to the lower pier, with her quarter just as near as I could have it, in order to get the advantage of the eddy. I wanted the eddy to take the stern while the current took the bow, which enables her to turn on her keel." He states: "When within 300 feet of the pier the engine was stopped entirely; when I touched her up she was about up to the pier; I think it was between her bow and fore-rigging. She was not going fast enough to suit me, gave her only eight to twelve revolutions and then stopped her." To the inquiry, what in your opinion occasioned the accident? the master answers: "The current was very strong, the vessel large, and I got deceived; we fell off and I lost my eddy." The master further states: "After I brought the vessel nearly to a standstill, I gave her a few turns ahead, and when I stopped the engine I waited for her to reach the main tide; her bow then was not within fifty or seventy-five feet of it; she was working up and out; in my opinion two more backward revolutions of the propeller would have saved her going onto the rock. Just as soon as I saw her bow strike the main tide I went back strong; when I first apprehended trouble she was in the current; the schooner did not stop dead at any time, she was ranging ahead a very little, not over a quarter of a knot; they had some little steerage way on the tow."

The account given by the engineer of the orders received by him from the master, respecting the handling of his engine, substantially agree with the master's statements, and they are in most respects corroborated by the testimony of Cox, who was a passenger on the tug. He states: "The schooner's bow swung out by the pier and commenced swinging into the river all the time. She went ahead very slowly, not running one half a knot per hour, went 5,070 feet from the lower corner of the pier, was perhaps two-thirds her length from the pier when she began to feel the current sensibly. When she struck the current, she was almost at a standstill, as far as moving ahead was concerned, but she moved down river quite rapidly at the time she struck the main current; heard bell to stop engine before we got up to pier, and she slackened her speed; next signal was one bell to go ahead. This was before her bow struck the current; next signal was three or four seconds after, to back and commenced backing violently." Cox further states: "The captain of the tug remarked, as the bow shot out past the pier 'it won't do to back her here, I shall have her stern in onto the rocks,' and then he immediately rung his bell to go ahead and she started ahead under the impulse of the movement. When he made this remark he was in the eddy, not entirely out by the pier. When he started her ahead, she went from two to three knots, about

two. She seemed to accelerate her speed a little when she struck the current."

The testimony in behalf of the libellants represents the movements of the tug as essentially different in many respects. The master of the schooner says: "They shoved her off at an angle with the stream; they stopped steam on the boat until about seventy-five feet from the lower pier, the schooner then going ahead about two knots, forcing her ahead angling with the river; as she struck the current that set down, her bow took that and swung her off, and as she struck the tide, she started ahead faster than she was going, and gained speed; as she struck the current she fell off, directly across the river, drifted down with it abreast to the current, and when she got over on the other side of the channel, the captain rung for the boat to go astern. We were then fifty to seventy-five feet from the rocks; after she got down further, he rung for more speed to back her stronger, but she drifted down and in a very few seconds touched the rocks; did not go within seventy-five feet of lower pier; after she got square across the river, she did not turn any at all, but drifted bodily with the current; should judge she was within seventy-five feet of the rocks before any signal to back was given. If they had stopped the vessel still before she struck the current, they would have had a better command of her. When she struck the current she was going about two knots per hour, but as soon as she struck it, she gained headway; when her bow struck the current, her stern was in the tide current and all clear of the eddy." This latter statement he reiterates in cross-examination, saying: "I speak of what I saw; I think the first order of bell to stop was given near the pier, just before we struck the current; as near as I recollect, the next order was to back her, only about a minute after; heard no order to go ahead."

The mate says he should think they were about 100 feet from the place where they struck when they commenced to back.

Mr. Marshall who was on the shore near the place where the schooner anchored, and who was looking at the vessel says: "The schooner passed into the current, and when the tide struck her, she went right across the river, did not seem to turn any, went down river and struck on the rocks. Previous to this season don't remember of seeing a vessel taken up there and shot out the way this one was; they always winded them at the wharf, or between the pier and the anchorage in the eddy. In attempting to wind the schooner they went up past the eddy."

The libellants have also produced three witnesses who had for many years been well acquainted with the river at this locality, and with the usual course of handling vessels in the current and eddy. These men were all on the deck of the Stine, a schooner then loading at the wharf, and their attention was called by her movements to the course taken by the tug in the present instance. One of them, Millbridge, says: "The schooner's jibboom came up to the end of the Stine, and when it was lapping over our stern, she was about seventy-five feet outside the Stine; she struck the current and appeared to be sagging fast towards the eastern shore, this attracted my attention through fear of trouble. When they struck the current the stern of the tug could be seen by me and there was no ripple to show that she was backing or turning. When she struck out into the current the motion was very rapid, quickened very much."

Derry says: "I could see the stern of the tug when she was half the distance across, and did not see the propeller working or any ripple in the water; the schooner came up rapidly and shot out into the current. The jibboom came up by the quarter of the Stine and her bow was then touching the eddy; when she was at the highest point, should judge half her length was in the current or nearly so, and her flying jibboom might have been up as high as the Stine's main rigging."

Peacock says: "I could see no indications that the tug was backing; she was about two eighths across the river."

The court has more than once read over all the evidence for the purpose of satisfying itself as to the cause of the disaster, and without referring in detail to the evidence of the various witnesses, the conclusion at which it has arrived is, that the master of the tug when he began to move forward with the schooner in tow did not intend to go above the lower pier to accomplish the winding of her. It is shown by Marshall's testimony, that it had been the practice previously to make the attempt below this pier, the eddy being there of the greatest width, and the current not being as strong as it was toward the upper end of the pier. When the tug had reached the place where the master originally intended to wind her, he found he would fail to accomplish his purpose, as is quite evident from Cox's statement that the master said "it won't do to back here, I shall have her stern in on to the rocks," and he immediately rung to go ahead. The tow then was under way, and without doubt would have reached the current, if the master had not put on more steam; he did however, for a longer or shorter time, run with greater speed, and instead of striking the current squarely, he ranged up altogether beyond what had been customary, as is manifest from the testimony of the three men from the Stine, whose attention was attracted to the course of these vessels from apprehension of peril. The bow of the schooner was not placed in the current until she had run up so far that the eddy had become very narrow, probably not one half of its greatest width at its base, and as the master of the schooner says, her stern was in the current at the same time

with her bow, by which the court understands that she went up near the eastern edge of the eddy, so that the greater portion of the hull would be, by the contraction of the eddy, exposed almost at the same instant to the force of the current, as the vessel ranged ahead. There is considerable discrepancy in the testimony as to the precise time when the tug began to back; those on the tug asserted that it was when she struck the eddy, whilst the master of the schooner and others on that side say it was not till within about seventy-five feet of the rocks; be this as it may, the result shows that the attempt was not made until it was futile, without effect, and should have been made sooner to have been successful.

In the opinion of the court, when the master of the tug found he could not safely wind the schooner below the pier, and that he must go further up, instead of putting on steam and running with more speed across and up the eddy, he should have remembered that by so doing, he was losing a large portion of the advantages from the eddy which were so necessary to accomplish his purpose, and he should, without fail, have retained the larger portion of the schooner's hull wholly within the eddy to aid him, instead of allowing her to pass without it and become exposed broadside to the current, in which position the master knew he could not control her movements, and that she would be subjected to imminent peril and disaster. In these respects the court finds there was a want of care and caution on the part of the tug, proportionate to the dangers to which the master by his conduct was subjecting the Whitten, and that for these reasons, the libellants are entitled to hold the tug accountable for damages sustained. Decree for libellants.